IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN CUTRIGHT,
          Plaintiff,
v.                                        Civil Action No. 1:04CV244
                                                 (Keeley)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION/OPINION

      Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

      Karen Cutright ("Plaintiff") filed applications for DIB and SSI on February 4, 2003, alleging disability beginning December 18, 2002, due to multiple sclerosis (R. 15, 69, 88, 379). Both applications were denied initially and on reconsideration (R. 46, 384). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Edward Banas held on November 19, 2003 (R. 456). Plaintiff appeared without counsel. The ALJ encouraged Plaintiff to contact an attorney (R. 460). He also told her he would like to refer her for a psychological consultative evaluation because Plaintiff had said she was going to counseling, but there were no records of mental health treatment. The ALJ therefore continued the hearing.

On April 13, 2004, Barbara Gibbs held a hearing at which Plaintiff, now represented by counsel, was present and testified, as well as Vocational Expert John Panza ("VE") (R. 406). On May 26, 2004, the ALJ issued an unfavorable decision (R. 12-30). The Appeals Council denied Plaintiff's request for review (R. 7), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Karen Cutright ("Plaintiff") was born on May 4, 1958, and was 46 years old at the time of the ALJ's decision (R. 69). She graduated from high school and completed nursing assistant classes (R. 94). She has past relevant work experience as a home health aide (R. 89).

On October 10, 1996, Plaintiff presented to neurologist Shiv Navada, M.D., for a consultation regarding possible multiple sclerosis (R. 171). Plaintiff's main complaint was of feeling tired all the time. She had occasional shortness of breath as well as some spasms in the lower back and pelvic region. She reported alternating constipation and diarrhea. She believed she had some altered sensation, in that she may cut herself without realizing it. She also questioned some right arm weakness, as she had difficulty using a nail clipper.

Plaintiff reported that two months earlier she had pain and "pins and needles" in her right leg which lasted for a day or two. This was treated with steroids. She had an episode of "everything going white" about five years ago. She reported a long history of headaches. She reported having had several MRI's and a spinal tap. Doctors at the Cleveland Clinic reportedly felt her symptoms were psychiatric in origin, but Plaintiff did not agree (R. 172).

Upon examination, Plaintiff's spine was nontender. There were no visible muscle spasms and no trigger or tender points (R. 172). Neck and lumbar ranges of motion were full. Plaintiff was

2

alert and fully oriented. She seemed slightly withdrawn and frustrated. Strength was normal in all extremities. Sensory examination was normal. Gait and station were normal. She could walk on toes and heels, tandem walk, and perform a deep knee bend.

Dr. Navada noted it was difficult to arrive at a diagnosis based on Plaintiff's history alone. She had multiple somatic complaints, of which the most pressing appeared to be her tiredness. She denied having sleep difficulty. Except for very brisk reflexes, her neurologic examination was essentially normal. Dr. Navada did note some scattered foci of increased T2 prolongation which could be suggestive of multiple sclerosis, but might also be noted in patients with migraines. He diagnosed multiple somatic complaints of unclear etiology; probable depression; and history of mixed headaches.

On October 31, 1996, Dr. Navada wrote to Plaintiff's treating physician, Dr. Ortenzio, stating that Plaintiff still had tiredness and dull holocranial headaches, but much better than in years before (R. 170). Upon further review, Dr. Navada and a colleague determined the small scattered foci of increased T2 prolongation on the MRI "were not very impressive." Myelin basic protein was negative in the cerebrospinal fluid ("CFS"), while oligoclonal band was positive.[1] Visual and auditory responses were normal. Dr. Navada opined that he was still "not quite convinced that [Plaintiff's] symptoms are from multiple sclerosis." He noted she had had symptoms for six or seven years "without significant abnormal physical findings." CSF was only partially abnormal and MRI showed only minor changes. He still could not be certain she did not have multiple sclerosis,

---

[1] Oligoclonal bands– discreet bands of immunoglobulins with decreased electrophoretic mobility; their appearance in eletrophoretograms of cerebrospinal fluid is a sign of possible multiple sclerosis or other diseases of the central nervous system. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 198 (30th ed. 2003).

although his "index of suspicion" was low. He finally diagnosed "Mixed headaches."

On April 24, 1998, Plaintiff presented to the Emergency Room ("ER") with complaints of a migraine headache for 24 hours (R. 174). A CT scan of the head showed no abnormality (R. 176).

An MRI of the cervical spine in July 1998, indicated minimal posterior spondylitic changes at C5-6, with no other abnormalities (R. 236).

Plaintiff underwent a sleep study in 1999, that resulted in an impression of periodic limb movements ("PLMS") and mild sleep apnea (R. 179). In addition, it was noted it took her 86 minutes to fall asleep, and she never reached REM sleep.

On March 12, 1999, Plaintiff underwent a brain MRI (R. 218). The results were consistent with multiple sclerosis plaques. There had been no significant change since her last examination in November 1995.

On February 24, 2000, Plaintiff saw her neurologist, Dr. Reahl, for her obstructive sleep apnea, periodic leg movement syndrome ("PLMS"), migraine headache, and multiple sclerosis (stable without treatment, no changes on MRI) (R. 217). She was continued on her same medications and scheduled for appointment in six months.

In August 2000, Dr. Reahl noted Plaintiff's PMLS was stable on medication, her migraines were stable on medication, and her MS was stable (R. 216). She advised a repeat polysomnogram to see if constructive sleep apnea remained a disruption to her sleep now that the restless leg syndrome was treated.

A subsequent sleep study in October 2000 was much improved, with sleep onset in 11 minutes, and REM onset in 163 minutes. Plaintiff was diagnosed with PMLS and possible behavioural insomnia, noting she slept better in the lab.

4

In November 2000, Dr. Reahl noted Plaintiff's PLMS was improved with medication, migraines were stable, and MS was stable without medication (R. 215).

On May 15, 2001, Dr. Reahl wrote to Plaintiff's treating physician, Dr. Ortenzio, assessing Plaintiff with restless leg syndrome, migraine headache, multiple sclerosis not yet on medication, and "cognitive changes." Dr. Reahl noted under "subjective" that Plaintiff complained of having lots of cognitive issues, such as forgetting her children's birthdays. These complaints raised the concern of "silent" MS attack/exacerbation. Dr. Reahl again advised a repeat MRI (Plaintiff's insurance company had refused), to assess for disease activity. If present, she would be placed in the "clinically probable Multiple Sclerosis group," and would be treated with medication. Dr. Reahl also wrote to Plaintiff's insurance company asking again for precertification for repeat testing.

On July 19, 2001, Dr. Reahl noted that Plaintiff's restless leg syndrome was still symptomatic despite maximum medication and her migraines were still not under control(R. 209). Her MS was still listed as not on medications but with no significant changes on the most recent scan compared to previous ones, and her cognitive changes were opined to be "likely related to her lack of good sleep and low serotonin."

On September 25, 2001, Plaintiff presented to Matthew Darmelio, M.D., for complaints of left knee pain (R. 184). She stated the knee hurt all the time but was worse with stairs, steps, and squatting. Physical therapy had helped tremendously. Upon physical examination, there was no effusion of the knee. She was stable to varus and valgus stress tests. She had negative Lachman's. She had some pain with patella compression. The diagnosis was patellafemoral syndrome with lateral patella tilt. The doctor opined that since Plaintiff was getting better with PT, she should continue with that.

On December 18, 2001, Plaintiff told Dr. Ortenzio she had lower and mid back pain radiating around to her chest and abdomen (R. 278). She had been working. Examination showed paravertebral muscle spasm in the thoracic region and lumbar region. The assessment was lumbar and thoracic sprain.

On January 7, 2002, Dr. Reahl noted Plaintiff's restless leg syndrome was again under control with medication; her migraine headaches were much better in terms of frequency, but still with trouble around her menses; and MS was still not on medication and with stable neurologic exams and MRI's for several years (R. 205). Dr. Reahl noted Plaintiff also complained of cognitive changes, but a Mini-Mental exam score was "good," with 29 points out of a possible 30 (R. 206). She opined the "differential include[s] pseudodementia vs. cognitive decline due to her MS."

On January 17, 2002, Plaintiff saw Dr. Ortenzio for her complaints of knee pain and swelling (R. 277). Her spirits had been "down." "Fortunately her MS ha[d] not flared up recently." She was having a lot of anxiety and a feeling of panic. She was diagnosed with DJD of the left knee, dysthymia, panic disorder, and MS.

On February 7, 2002, Plaintiff presented to Dr. Ortenzio's office complaining of a migraine affecting the left side of her head (R. 276). She was diagnosed with migraine.

On March 15, 2002, Plaintiff reported to Dr. Ortenzio's office that she "continue[d] to struggle with her MS" (R. 275). She was having more bladder problems. She was diagnosed with MS, urinary tract infection, neurogenic bladder, and irritable bowel syndrome.

On May 20, 2002, Plaintiff presented to Dr. Ortenzio's office for complaints of pain in both legs (R. 274). She had marked calf tenderness bilaterally. She was diagnosed with myospasm in both legs and questionable superficial phlebitis.

Plaintiff next saw Dr. Darmelio nearly a year later when she fell and injured her left hand (R.

184). She had fractured the fourth and fifth fingers of her left hand. By two weeks later, she could make a full fist and open her hand all the way. She still had pain, but the doctor thought she was "doing okay."

An MRI in June 2002 was still "essentially unchanged from previous exam" a year earlier. The findings were consistent with MS (R. 204).

On July 8, 2002, Dr. Reahl advised ordering a lumbar puncture, stating: "It would stand to reason that if she has had Multiple Sclerosis for at least the past ten years we should be able to obtain a positive for oligoclonal bands." She also ordered formal neuropsychological testing to assess depression and cognitive impairments. Plaintiff scored a perfect 30 out of 30 on a Mini Mental Examination (MMSE) (R. 199).

Dr. Reahl wrote to Dr. Ortenzio regarding Plaintiff's recent MRI and other developments (R. 201). Plaintiff stated she had been experiencing increased vertigo. She "still insist[ed] that her cognitive abilities have declined, primarily memory." An increase in Effexor helped her mood but not her memory. She also described feelings of numbness "she described as parts of body just not feeling like it should." She also said she fell and broke fingers on her left hand two months earlier. The MRI was noted to be "stable."

Plaintiff saw Dr. Ortenzio on July 25, 2002 (R. 273). She reported having no further DVT problems. Her neurologist was questioning the MS diagnosis. Dr. Ortenzio diagnosed hypertension; MS v. stress reaction; history of DVT; ASCVD; urinary tract infection; depression v. hospital adjustment reaction; and obesity.

On July 26, 2002, Plaintiff presented for a lumbar puncture (R. 196). The diagnosis was

demyelinating disease[2] (R. 195).

Plaintiff underwent a neuropsychological evaluation on August 28, 2002, completed by neuropsychologist Raymond Kim DiPino, Ph.D. (R. 185). Upon mental status exam, Plaintiff's affect was flat, her interpersonal behavior was normal, her mood was depressed, her thought processes were normal, her speech was normal, and her language was normal (R. 186). The evaluator opined the test results were valid. Plaintiff was alert and aware, with the exception of missing the correct date by two days and the correct time by 30 minutes. Immediate recall was at the lower end of the average range. Her working memory was also at the lower end of the average range. Cognitive flexibility was within normal limits. On a 14-minute sustained-attention test, there were indications of inattentiveness, impulsivity, and vigilance limitations. Retention and comprehension were within normal limits. Grip strength was within normal limits, but her right hand was significantly stronger than her left. Manual dexterity was within normal limits.

On the Personality Assessment Inventory Plaintiff "reported an unusual degree of concern about her physical functioning and health matters in general. Individuals with similar responses are likely to report that their daily functioning has been compromised by one or more physical problems. Although they may believe their physical health is good in general, they are likely to report that the health problems they have are complex and difficult to treat successfully."

The psychologist assessed Plaintiff as follows:

Ms. Cutright exhibited mild disorientation, missing the correct date by 2 days. She exhibited mild inconsistencies on tests of attention. Acquisition and retention of verbal and visual information were WNL. Language functionings were generally intact with verbal fluency at the lower end of the average range for phonemic and

---

[2]Any condition characterized by destruction of the myelin sheaths of nerves. Cf. Multiple sclerosis. Id. at 531.

semantic categories. Intellectual functions were intact but mildly below estimates of her baseline level of functioning. There were suggestions of mild constructional difficulties when required to copy 2-and 3-D figures. Motor functions were generally intact. Although her grip strength was WNL bilaterally, it was significantly weaker in her left hand compared to her right hand. Results of the PAI suggested elevated concerns about her physical functioning and health matters in general and a rather negative self-evaluation. The relatively mild deficits exhibited by Ms. Cutright are suggestive of declines in functioning from estimated baseline levels and appear consistent with MRI findings and her prior diagnosis of MS. However, it appears that variation in her psychiatric status, including increased concern over her somatic functioning, which is frequently seen in mild cases of MS, may also contribute to the disturbances she experiences on a daily basis. Interventions that help reduce her level of stress and deal with physical changes she is experiencing may be of assistance. Re-testing, in a year, or sooner if significant neurocognitive declines occur, may be useful to track possible changes in her level of functioning.

(R. 188).

On September 12, 2002, Dr. Reahl diagnosed Plaintiff with Relapsing Remitting Multiple Sclerosis, stable but definite. (R. 192). She prescribed Rebif. Plaintiff's restless leg syndrome was stable.

On September 19, 2002, Plaintiff told Dr. Ortenzio she was still dealing with the issue of diagnosis of MS (R. 272). She was still having bladder difficulty. She reported a neurology specialist at the Cleveland Clinic told her she probably had MS but it was not definitive at this point.

On October 3, 2002, Plaintiff told Dr. Ortenzio that "they have finally confirmed her diagnosis of MS" (R. 271). She was having a migraine headache. She was given a shot for the migraine and advised to go home and rest the rest of the day.

On January 14, 2003, Dr. Reahl saw Plaintiff for a follow-up (R. 190). The Rebif was associated with severe headaches. She reported double vision off and on, especially when tired. She reported she was not working now, "mainly due to pain in her left leg." She also reported shaking a lot at night and jerking of her legs, consistent with a flare up of her restless leg syndrome.

Plaintiff's family said she had "a lot of attitude these days," despite being on Effexor. She said she was concerned over losing her job. Dr. Reahl switched Plaintiff to a different medication and increased the medication for her restless leg syndrome.

In March 2003, State agency reviewing psychologist Samuel Goots, Ph.D., opined that Plaintiff had an anxiety-related disorder which was not severe (R. 250). Her limitations of activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace were all mild, and she had no episodes of decompensation (R. 260).

On March 25, 2003, Plaintiff underwent a physical examination on behalf of the State agency for her complaints of "multiple sclerosis, migraines, and bad knees" (R. 264). Upon examination, Plaintiff ambulated with a normal gait, which was not unsteady, lurching or unpredictable (R. 265). She did not require an assistive device. She appeared stable at station and comfortable supine and sitting. Her intellectual functioning appeared normal, as did recent and remote memory for medical events. Examination of the knees revealed mild to moderate tenderness and crepitation bilaterally, with no redness, warmth, swelling or laxity except swelling of the left knee. Plaintiff could walk on heels and toes and tandem and squat without difficulty. Dr. Kerbyson diagnosed obesity, osteoarthritis of the knees, history of cephalgia, and relapsing-remitting multiple sclerosis (R. 267). An x-ray of the left knee showed degenerative changes of the posterior patella (R. 270).

On April 16, 2003, State agency reviewing physician Cynthia Osborne, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC"), opining Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk about six hours in an eight-hour day; and could sit about six hours in an eight-hour workday (R. 299). She would have no postural, manipulative, visual, communicative or environmental limitations.

10

On May 6, 2003, Plaintiff presented to Dr. Reahl for follow up of her restless leg syndrome (R. 325). She reported she had not done well since her last visit. She continued to have leg movement, described as spasms. She also continued to have headaches eight to ten times per month. They started in the neck. She admitted to being under a lot of stress recently, with several deaths in the family, and her mother being seriously ill. Dr. Reahl diagnosed MS, restless leg syndrome, and headache.

On June 6, 2003, State agency reviewing physician Fulvio Franyutti completed an RFC agreeing with the exertional limitations found by Dr. Osborne, but adding that Plaintiff should avoid concentrated exposure to extreme cold (R. 310). He also reduced her exertional level to medium based on pain and fatigue.

On June 23, 2003, Plaintiff reported to Dr. Ortenzio that she had fallen out of bed and had a stiff neck and pain in her left shoulder (R. 314). X-rays showed minimal degenerative change of the cervical spine with slight straightening (R. 319). There was no evidence of fracture. Plaintiff was diagnosed with acute pain in the left shoulder and neck and acute strain of the left shoulder and neck, due to fall (R. 315).

On July 7, 2003, Plaintiff saw psychologist Charles M. Green for an intake evaluation (R. 366). She reported her 25-year-old daughter had moved in and was causing trouble between her husband and herself. The daughter had brought a girlfriend to visit, in whom her husband expressed an interest. Plaintiff had been staying at her mother's from early morning to late evening. She loved her husband but he felt he needed to go, so she let him. She basically took care of him. He did not help with bills or do chores. She liked to work around the house. Money was really bad. She was waiting for disability. Her mother had arthritis, diabetes, and heart trouble and was in constant pain.

11

Plaintiff's husband told her there was nothing wrong with her mother, she just wanted to get her way. She had been a caretaker her whole life. Her husband hurt his back four years ago and could not do carpenter work again. She felt more like his mother than his wife. She lost her job, could not drive, lost her daughter, and lost her grandchildren, and her Daughter called her "every name under the sun."

Mr. Green completed a form for Plaintiff's insurer, stating she had current diagnoses of 309.28 (mixed anxiety and depressed mood) and 301.9 (personality disorder NOS) (R. 368). Her current GAF was 55.[3] Her stressors were very high, with too little personal and economic support.

Mr. Green opined Plaintiff had moderate symptoms of impaired attention/concentration and judgment, and other limitations were mild. She had moderate avoidant behavior and mild panic attacks. She had moderate low esteem/guilt and mild depressed mood, labile mood, hopelessness/helplessness, and irritability/inappropriate anger. She had moderate social functioning impairments of social isolation and perfectionism. She had mild unstable/intense relationships, oppositional/defiant, and agitation.

On August 25, 2003, Plaintiff reported to Dr. Reahl her migraines were less frequent since her medication change (R. 324). Her MS was stable on medication. Her restless leg syndrome was possibly undermedicated. The doctor noted Plaintiff had excessive daytime sleepiness, but opined this could have been in part due to superimposed insomnia due to life stresses. Plaintiff noted that since her last visit three months earlier, she "has also been in the process of a divorce [that] hit her

---

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

very hard and she has been having crying spells." She reported her husband had left her for a friend of their daughter's (R. 327). She had been seeing a counselor for marriage counseling, and now that she was getting divorced, that same counselor had assumed her psychiatric care. She was not sleeping "due to all the tumult in her life." She also had significant financial stress, "since she is not yet on disability." The doctor prescribed Wellbutrin in addition to Plaintiff's regular medications.

On September 22, 2003, Plaintiff presented to Dr. Ortenzio with complaints of depression with divorce in progress, history of DVT, and inability to sleep. He diagnosed insomnia, sinusitis, depression, obesity and DVT.

On October 8, 2003, Plaintiff presented to Dr. Ortenzio with complaints of ankle and leg swelling over the weekend (R. 339).

On October 29, 2003, Plaintiff told Dr. Ortenzio she had increased fatigue, and her legs gave out (R. 336). He diagnosed dysthymia, MS, and DJD of the knee.

On December 4, 2003, Dr. Reahl noted Plaintiff's diagnosis of restless leg syndrome, migraine headaches, MS on medication, cognitive changes, and DVT (R. 378). Plaintiff said she had done well overall since her last visit. She was under a great deal of stress since her divorce, however. She was having burning and tingling down her arm and some urinary incontinence. She had missed some medication due to cost. She was awaiting the outcome of a disability hearing. Dr. Reahl opined the stress may be causing her numbness.

On December 30, 2003, Plaintiff underwent a psychological evaluation, performed by Jennifer Robinson, M.A. (R. 327). She reported thoughts of suicide with intent in July, but not currently. She had had a very difficult year, with her husband leaving and her mother, who was ill, living with her. She also reported significant financial problems since being unable to work.

13

Upon mental status examination, Plaintiff was casually attired with good hygiene and grooming. Eye contact was good, verbal responses were elaborate, speech was relevant and coherent, and she was sure of time, name and place, but not the date. She appeared depressed and her affect was restricted. There was no indication of formal thought disorder. Judgment skills were moderately deficient. Immediate memory was mildly deficient. Recent memory was within normal limits and remote memory was within normal limits. Concentration was mildly deficient, persistence was within normal limits, and pace was within normal limits.

Plaintiff obtained scores of 79 verbal, 74 performance, and 75 full scale on the WAIS-III IQ test (R. 329). Ms. Robinson opined the results were valid. Plaintiff read at the 8th grade level, spelled at the high school level, and performed arithmetic at the 5th grade level. These results were also considered valid.

Plaintiff reported arising around 9:00 a.m. She currently lived with her ailing mother. She was unable to cook due to forgetting she had left things on the stove and forgetting to turn the stove off. She did some cleaning and laundry. She was unable to drive long distances due to falling asleep. She occasionally shopped. She read and listened to the radio, although she said she had low interest in anything currently. Social functioning and social interactions were within normal limits. She used to go to the MS support group, but not recently. Ms. Robinson diagnosed Plaintiff with Major Depressive Disorder, recurrent, moderate, and Borderline Intellectual Functioning.

On November 25, 2003, Plaintiff's counselor/psychologist completed a Mental Ability to do Work-Related Activities form, opining Plaintiff would have a marked limitation in understanding, remembering and carrying out detailed instructions, but only a slight or no limitation in understanding, remembering, and carrying out simple instructions (R. 334). She would have a slight

14

limitation on her ability to make judgments on simple work-related decisions. He found it likely her ability to respond appropriately to supervision, co-workers and work pressures would be affected by her impairments, but noted he had not formally assessed her, so he did not check the amount of limitation. He noted the following symptoms intermittently: emotional lability, bitterness, disgustedness, over-personalization, episodes of desperation, feeling of helplessness and hopelessness, and interpersonal reactivity (R. 335).

On March 3, 2003, Plaintiff returned to Dr. Reahl for follow-up of her MS, headaches, and restless leg syndrome (R. 374). She said she had been doing better. She was awaiting a hearing for disability, and her divorce would be final the next month. Her current situation was still stressful. She was living with her mother, who was trying to control her, and she continued to have burning in her arms, which also felt very tired. A new MRI was ordered.

Plaintiff's March 2004 MRI indicated what "could represent demyelinating disease" (R.

Plaintiff continued seeing Charles Green for individual counseling sessions weekly through at least March 2004. (R. 372).

Plaintiff's second administrative hearing was held on April 13, 2004 (R. 406).

The ALJ entered her decision on May 26, 2004.

**Evidence submitted to the Appeals Council**

On April 29, 2004, Plaintiff was admitted to Chestnut Ridge Hospital for increased depression over the past month, due to her MS and memory problems (R. 399). She also had a recent divorce, making her even more depressed, as well as significant financial stressors. She couldn't really enjoy her regular activities. Sleep was erratic and concentration was poor. She had thoughts of hurting herself, especially by overdosing. She also thought about driving her car into

the lake. She had very poor social supports and seemed increasingly depressed. She had never been admitted for psychiatric problems in the past.

Upon mental status examination, Plaintiff's mood was depressed, and her affect was congruent with her mood. Her thought process was goal directed. Her thought content was positive for suicidal ideations, negative for homicidal ideation. She had no perceptual disturbance. Her insight and judgment were fair. The psychiatrist's diagnosis was major depressive disorder and history of panic disorder. Her GAF was assessed at 30.[4] She was admitted and put on suicide precautions, escape precautions, and restricted to the unit.

On May 13, 2004, a psychologist at Chestnut Ridge performed a neuropsychological evaluation of Plaintiff (R. 403). The results were "indicative of mild frontal lobe dysfunction and psychomotor slowing." The doctor noted these difficulties could be seen with active MS and mood disorders, but were not specific to depression. She did not endorse significant motor symptoms suggesting active MS. It was difficult to determine the extent to which her distress was contributing to her cognitive symptoms. There was nothing in her performance to indicate she was not trying or was purposely trying to do poorly. She did not appear to demonstrate significant impairment that would explain some of her complaints or concerns about her memory. The doctor recommended "she actively seek opportunities to participate in activities and social interaction, in order to benefit her cognitive and mood functioning."

On September 16, 2004, Plaintiff's past supervisor wrote a statement saying Plaintiff had been employed by the Harrison/Clarksburg Health Department until December 18, 2002 (R. 397).

---

[4]A GAF of 21-30 indicates **Behavior is considerable influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends). DSM-IV at 32.

She also reviewed plaintiff's attendance record, noting Plaintiff had missed 19 ½ days due to illness in 2000, 29 days in 2001, and 29 3/4 days in 2002 (R. 397).

**Evidence Submitted to the Court**

Plaintiff submitted to the Court evidence that she was admitted to Chestnut Ridge Hospital again on September 4, 2004 and discharged on September 21, 2004. The records from that admission indicate she had been committed to Sharpe Hospital for suicidal ideation and psychosis; had tried to elope from Valley Mental Health Crisis Unit; was diverted to Chestnut Ridge; tried to elope during neuropsychological testing; was disruptive around peers; and hid in a wardrobe in a peer's bedroom, after which she was transferred to the psychiatric intensive care unit. During her admission at Chestnut Ridge, Plaintiff "displayed significant profound psychosis," with auditory and visual hallucinations and delusions. She was considered "not to have decision making capacity." She was started on Risperdal, after which she "cleared up tremendously." By discharge she was considered to have decision making capacity.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits as set forth in Section 216(i) of the Social Security Act so as to be insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. Since December 18, 2002, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe " and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: relapsing/remitting multiple sclerosis; obesity; osteoarthritis of the knees; history of cephalgia;

17

and depression ( 20 CFR §§ 404.1520(c) and 416.920(c).

4. Since December 18, 2002, the claimant had had no medically determinable impairment whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulations No. 4 (20 CFR Part 404).

5. The claimant's allegations regarding her impairment-related limitations, as purported to exist since December 18, 2002, are not fully credible.

6. Since December 18, 2002, the claimant has had the residual functional capacity to perform light work that affords the option to either sit or stand; allows elevation of the legs up to 15 inches from the floor whenever seated; requires no crawling or kneeling; requires performance of no overhead tasks; entails no concentrated exposure to cold temperatures; entails no exposure to hazards, such as dangerous moving machinery or unprotected heights. The work should be at a low stress level, i.e., unskilled work that entails no production line type of duties or pace and involves routine and repetitive processes that primarily dealing [sic] with things rather than people (20 CFR §§ 404.1567 and 416.967).

7. Since December 18, 2002, the claimant has at all times been unable to perform the requirements of her vocationally relevant past work (20 CFR §§ 404.1565 and 416.965).

8. The claimant is considered for decisional purposes as a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9. The claimant has at least a "high school education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has a semiskilled work background but has acquired no particular skills that are transferable to any job that has remained within her residual functional capacity to perform since December 18, 2002 (20 CFR §§ 404.1568 and 416.968).

11. Although the claimant has had impairment-related limitations since December 18, 2002, that have precluded her ability to perform the full range of even light exertional work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs within the national economy that she has since remained able to perform. Examples of suitable jobs included information clerk/receptionist (3,000 locally/750,000 nationally), guard/doorperson (1,000 locally/144,000

nationally ) and cashier (10,000 locally/1,000,000 nationally).

14.     The claimant has not been under a "disability," as defined in the Social
        Security Act, at any time since December 18, 2002 (20 CFR §§ 404.1520(g)
        and 416.920(g)).

(R. 29-30).

## IV.  Contentions

A.      Plaintiff contends:

1.      The ALJ's finding concerning Plaintiff's residual functional capacity did not
        take into account the worsening symptoms of MS and depression.

2.      Additional evidence incorporated into the record by the Appeals council
        shows that Plaintiff's mental condition worsened before the ALJ issued her
        decision.

3.      This matter must be remanded pursuant to the sixth sentence of 42 U.S.C. §
        405(g) for consideration of new and material evidence.

B.      The Commissioner contends:

1.      Substantial evidence supports the Commissioner's decision that Plaintiff was
        not disabled under the Act.

2.      The Appeals Council properly determined that the additional evidence
        submitted after the ALJ issues her decision did not provide a basis for
        changing the ALJ's decision.

3.      The additional evidence submitted to the District Court is not material.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Worsening Symptoms of MS and Depression

Plaintiff argues that the ALJ's RFC did not take into account her worsening symptoms of MS and depression. Defendant contends substantial evidence supports the Commissioner's determination that Plaintiff was not disabled under the Act.

Psychologist Jennifer Robinson, M.A., found that Plaintiff had a Verbal IQ of 79, Performance IQ of 74, and Full Scale IQ of 75 on the WAIS -III. She found these IQ scores were valid. Achievement testing indicated Plaintiff read at an eighth grade level. Ms. Robinson diagnosed Plaintiff with Major Depressive Disorder, recurrent, moderate; and Borderline Intellectual Functioning.

The ALJ rejected the diagnosis of Borderline Intellectual Functioning for the following reasons:

> The claimant completed high school, obtained a valid driver's license, obtained certification as a nursing assistant, performed exceptionally well on two MMSE tests

and ostensibly completed a number of application-related documents that required significant cognitive abilities (Exhibits 1E, 4E, 5E, 6E, 9E, 10E, 11E, 12E, 13E, 14E, 15E, and 16E).

(R. 25). The ALJ does not state that the IQ scores were invalid, just inconsistent with other evidence. The ALJ does not cite another IQ test in the record or any other reasons the actual scores on this test should be considered invalid. The undisputed evidence in the record is therefore that the IQ test results are valid. Borderline Intellectual Functioning is defined by the DSM-IV as "an IQ in the 71-84 range." See DSM-IV at 684. There does not appear to be any requirement, as there is with a diagnosis of Mental Retardation, that the individual manifest the symptoms prior to age 22.

The undersigned therefore finds that substantial evidence does not support the ALJ's rejection of the diagnosis of Borderline Intellectual Functioning.

Defendant argues that the ALJ properly discounted the diagnosis because it was inconsistent with other evidence, such as Plaintiff's having graduated from high school; completed nursing assistant classes, obtained a driver's license; and completed a number of application forms. Plaintiff argues, however, that the fact that she performed at a higher level of functioning in earlier years actually supports her contention that her cognitive functioning had declined, most likely due to her MS. Except for completing the forms, all the evidence cited by the ALJ and Defendant was from years ago. Plaintiff additionally points out that a neuropsychological exam performed a year and a half before the psychological exam indicated her IQ to be 95. Plaintiff then argues that a loss of measured intellectual ability of at least 15 IQ points is among the diagnostic criteria in Listing 12.02, for Organic Mental Disorders.

Pursuant to Listing 11.09 for Multiple Sclerosis, mental impairments are assessed under 12.02 for Organic Mental Disorders. Listing 12.02 is met when the requirements for both "A" and

"B" or the requirements in "C" are met. One of the "A" requirements is: "Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels . . . ."

This is not to say that Plaintiff meets this or any Listing. Further, the undersigned does not know that the "Shipley Institute of Living Scale" IQ test, cited by Plaintiff to support her argument, is acceptable evidence of IQ for Social Security cases. The undersigned cannot without more, however, determine whether substantial evidence supports the ALJ's failure to address the issue of whether Plaintiff's cognitive abilities may have decreased.

Defendant finally argues in this regard: "Regardless, even if Plaintiff had borderline intellectual functioning, the ALJ's RFC accommodated her by limiting her to low stress, unskilled work involving routine and repetitive processes." (Defendant's brief at 10). After rejecting the diagnosis of Borderline Intellectual Functioning, the ALJ did state: "In any case, the residual functional capacity prescribed hereinafter appropriately accommodates whatever cognitive deficiencies as may be deemed to limit the claimant" (R. 25). While this may be true, the undersigned finds the rejection of the diagnosis of borderline intellectual functioning and lack of any discussion of declining cognitive abilities may have affected more than just the RFC. It is possible it could also affected, for example, the ALJ's perception that Plaintiff was not entirely credible.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's analysis or conclusions regarding Plaintiff's mental impairments.

## C. Evidence Submitted to the Appeals Council

Plaintiff next argues the additional evidence incorporated into the record by the Appeals Council shows that Plaintiff's mental condition worsened before the ALJ issued her decision. Defendant contends the Appeals Council properly determined that the additional evidence submitted

after the ALJ issues her decision did not provide a basis for changing the ALJ's decision. In Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council will consider evidence submitted to it if the evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision. Wilkins further defined the terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.

Id. at 96.

Defendant first argues that the evidence is not new "because Plaintiff easily could have submitted it to the ALJ before the ALJ issues her decision." (Defendant's brief at 12). The undersigned does not reach the merits of Defendant's argument because Plaintiff has established good cause for her failure to submit the evidence before the ALJ's May 26, 2004 decision. Plaintiff contends the records were not printed until June 1, 2004. A review of the two medical records indicates Plaintiff may be correct, as the date 6/1/2004 appears in the footer of each (R. 399-405).

In addition, the undersigned finds the medical records from April 29, 2004, and May 13, 2004, are not duplicative or cumulative.

Defendant also argues the evidence is not material "because it would not have changed the ALJ's decision that Plaintiff could perform light, unskilled, low stress work which involved only routine and repetitive processes." (Defendant's brief at 13). The undersigned finds, however, that there was a "reasonable possibility" that the evidence could have changed the outcome, especially records of Plaintiff's admission to Chestnut Ridge Hospital with a GAF of 30 and her placement on suicide and escape watch a month before the ALJ's decision. Id. The undersigned notes that Dr.

Yamamoto's evaluation of Plaintiff was considered to be valid and Plaintiff's performance did not indicate she was purposely trying to do poorly or was not trying. Further, the evidence of Plaintiff's frequent absences from work may also reasonably have changed the outcome. The ALJ several times noted that Plaintiff was able to work despite her MS. The evidence from Plaintiff's supervisor, however, indicates Plaintiff was absent from work at least 19 ½ days in 2000, 29 days in 2001, and 29 3/4 days in 2002 (R. 397). Defendant correctly argues that this evidence "shows only that Plaintiff claimed she was too sick to work on several occasions since 2000." (Defendant's brief at 13). On the other hand, the VE testified that a worker would generally be permitted to miss only to one-and-a-half days of work per month (R. 454). The newly-submitted evidence indicates Plaintiff missed more than 1 ½ days in each of seven different months in 2002 (R. 398). The undersigned therefore finds this evidence could "reasonably" have changed the outcome of the case.

The undersigned therefore finds substantial evidence does not support the Appeals Council's determination, without explanation, that the new evidence did not provide a basis for changing the ALJ's decision.

### C. New Evidence Submitted to the Court

Plaintiff finally argues this matter must be remanded pursuant to the sixth sentence of 42 U.S.C. § 405(g) for consideration of new and material evidence. Defendant contends the additional evidence submitted to the Court is not material because it "provided evidence of Plaintiff's condition four months after the period at issue." The ALJ entered her decision on May 26, 2004. Plaintiff's admission to Chestnut Ridge for suicidal ideation and psychosis occurred on September 4, 2004, only 14 weeks later. Because the undersigned has already recommended this matter be remanded to the Commissioner for other reasons, he does not address the merits of this argument. On remand,

24

both parties shall be permitted to submit evidence that is relevant to the period at issue.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for SSI and DIB is not supported by substantial evidence, and I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED** by reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Secretary for further proceedings consistent and in accord with this Recommendation for Disposition.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

Respectfully submitted this _____ day of February, 2006.

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE